UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CRIMINAL MINUTES - GENERAL      'O'

| Case No. | CR 14-590-CAS | | Date | April 15, 2015 |
|---|---|---|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER | | | |
| Interpreter | N/A | | | |

| Catherine Jeang | Not Present | Kimberly Jaimez, Not Present |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder, Tape No.* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendants: | Present | Cust. | Bond | Attorneys for Defendants: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| | | | | GEORGINA WAKEFIELD, DFPD | NOT | X | |
| JOSE LUIS RODRIGUEZ | NOT | X | | ANDRE TOWNSEND, DFPD | NOT | X | |

**Proceedings:** **(In Chambers)** DEFENDANT'S MOTION TO SUPPRESS (Dkt. No. 35, filed February 16, 2015)

## I. INTRODUCTION

On October 7, 2014, defendant Jose Luis Rodriguez was charged with Theft or Receipt of Stolen Mail, in violation of 18 U.S.C. § 1708. Through this motion, the defense seeks to suppress evidence found during a November 30, 2012 search of a Cadillac Deville automobile, as well as post-arrest statements and evidence derived therefrom. Dkt. No. 35. The government filed an opposition on March 2, 2015, and defendant filed a reply on March 9, 2015. Dkt. Nos. 38, 39. On March 16 and 17, 2015, the Court conducted an evidentiary hearing and heard argument from counsel. See Dkt. Nos. 49, 50. The Court then requested that the parties file supplemental briefs, which each side did on March 27, 2015. Dkt. Nos. 46, 47. After considering the parties' arguments, the Court **DENIES** the motion to suppress for the reasons that follow.

## II. FACTUAL BACKGROUND

The Court first sets forth relevant facts as represented in a police report written soon after the stop and search in question, and in declarations submitted by the involved officers. The Court then summarizes evidence adduced at the suppression hearing, at which defense counsel questioned the officers' account of events, and in post-hearing briefing.

### A. The Police Report and Officers' Declarations

During the late evening and early morning hours of November 29 and November 30, 2012, Long Beach Police Department ("LBPD") Officers David Okerman and Jose Gonzalez

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

were patrolling the area of Santa Fe Avenue and 23rd Street in Long Beach, California, in a marked patrol car. Okerman Decl. ¶ 3; Gonzalez Decl. ¶ 3. Okerman declares that it had been "raining off and on all night," and that few people were on the street at the time of the encounter. Okerman Decl. ¶ 4. At approximately 11:47 P.M. on November 29, 2012, while responding to an unrelated burglary report, Okerman observed a man, alleged to be defendant, standing in front of a United States Post Office collection box. Id. ¶ 6. The man was facing the street and looking inside the mailbox, and standing near a white vehicle later determined to be a 1994 Cadillac Deville. Id. That collection box and another located near it had doors facing the curb which can be opened to slide in mail, and one box had an open spout facing the street so that persons in vehicles can drop off mail without exiting the vehicle. Id. ¶ 7. Okerman declares that he "noted the man standing outside in the rain and wondered why he would not use the vehicle drop in light of the poor weather and late hour." Id. The officers, however, drove on respond to the burglary. Id. ¶ 8.

At approximately 12:45 A.M. on November 30, 2012, after responding to the burglary, Okerman and Gonzalez headed south on Santa Fe Avenue and, passing the mailboxes, saw what appeared to be the same person leaning against the same box. Id. Okerman declares that it appeared that the man "was looking inside or tampering with the mail box and not in the process of mailing a letter." Id. ¶ 9 (emphasis in original). Okerman also observed a woman, later identified as Malissa Faith Santory, sitting in the driver's seat of the Cadillac, and noticed that the vehicle did not have a front or back license plate. Id. ¶ 10; Mot. Ex. A (Police Report) at 4.[1] Okerman declares that, because of the lack of license plates, the officers made a U-turn on Santa Fe Avenue to return to the area of the collection boxes. As they did so, the Cadillac began to drive north on Santa Fe Avenue, and then turned east on 23rd Street. Id.

The officers pulled over the Cadillac on 23rd Street. Okerman declares that they did so pursuant to California Vehicle Code 5200(a), which prohibits driving a vehicle without valid license plates. Okerman Decl. ¶ 11; Police Report at 4; see also Gonzalez Decl. ¶ 4 (stating that the traffic stop was conducted "for no license plates"). Gonzalez contacted the driver while Okerman approached the passenger side of the Cadillac. Okerman states that he noticed that the passenger was wearing a black hat and a black hooded sweatshirt, like the man observed at the collection box, and that Okerman therefore "concluded that this was the same individual standing beside the collection boxes previously." Okerman Decl. ¶ 11.

Santory, who was driving, said that she did not have a California driver's license. Police Report at 4. Gonzalez declares that "as a matter of routine traffic stop questioning," he then

---

[1]Gonzalez testified that he wrote the police report after speaking to the other officers involved in the traffic stop and investigation. Hr'g Tr. Mar. 16, 2015 at 17:15-23.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**      **'O'**

asked Santory and defendant if either was on probation or parole.  Defendant responded that he was on parole for robbery.  Gonzalez Decl. ¶ 6.  Gonzalez checked Santory's information for wants and warrants, finding two warrants and a want.  Police Report at 4.  Defendant gave Okerman his identification, and Gonzalez checked defendant's information for wants and warrants as well.  This search returned an indication of parole for robbery.  Police Report at 4; Okerman Decl. ¶ 11; Gonzalez Decl. ¶ 7.  At around this time, LBPD Officers Kong and Tith, who were also patrolling the area, arrived on the scene and began to assist Okerman and Gonzalez.  Okerman Decl. ¶ 12.; Tith Decl. ¶ 4.

Okerman asked defendant to exit the vehicle for a patdown search.  Police Report at 4; Okerman Decl. ¶ 13.  Okerman declares that he did so because of safety concerns based on (1) defendant's parole status for robbery, (2) defendant's "suspicious behavior in front of the collection boxes," and (3) the fact that defendant was riding in a car lacking license plates late at night.  Okerman Decl. ¶ 13.  Okerman walked defendant to the front of a police vehicle.  Okerman Decl. ¶ 14.  The report states that as defendant exited the vehicle, his hands were "down by his front waistband," and that Officer Tith observed him "drop a wrinkled tissue paper out of his hands onto the ground."  Police Report at 4; see also Tith Decl. ¶ 7.[2]  Okerman declares that he "searched [defendant] for weapons and contraband," and that he observed defendant drop, from his left hand onto the ground, a "glass round pipe, containing an off-white crystal-like substance, commonly used to smoke crystal meth."  Police Report at 4; see Okerman Decl. ¶ 14.  Tith picked up the tissue paper defendant had dropped, unwrapped it, and found "two small plastic bindles containing an off-white crystal-like substance, appearing to be crystal meth."  Police Report at 4; Tith Decl. ¶ 7.  Okerman declared: "After finding the glass pipe and observing the small plastic bindles with what appeared to be methamphetamine, I determined that there was probable cause to arrest the defendant" for possession of a controlled substance, possession of drug paraphernalia, and violation of parole.  Okerman Decl. ¶ 15.

Okerman and Kong handcuffed defendant "pending further investigation."  Police Report at 4; Okerman Decl. ¶ 15.  Tith picked up the pipe and held onto the purported drugs, and then gave them to Okerman.  Okerman maintained possession of the pipe and drugs until he later placed them into an evidence locker.  Defendant and Santory were arrested at approximately 2:00 A.M. Id. at 3.

Okerman then searched the car "for further evidence of narcotics use and/or trafficking."  Okerman Decl. ¶ 16.  Okerman found in the vehicle mail and checks from Los Angeles and surrounding areas, some of which Okerman believed to be from the mailbox near which he had

---

[2]Tith testified at the hearing that he showed Okerman the tissue paper containing the bindles prior to the search of the Cadillac.  Hr'g Tr. Mar. 17 at 35:9-14.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**            **'O'**

seen defendant because of the "close proximity of the addresses written on the envelopes." The allegedly stolen mail was found under the front passenger seats, and the checks were found in the rear seat. Id.; Okerman Decl. Ex. B (Property Report). Okerman also declares that he found in the Cadillac "sticky mouse traps and scrappers with glue on them," which he avers are "commonly used for creating fishing devices" for extracting mail. Okerman Decl. ¶ 16. In the trunk of the car, Okerman found a backpack containing "a fully assembled fishing device." Id. Okerman took photos and collected the items found in the vehicle, maintaining possession of them and then placing them into an evidence locker. Police Report at 4.

Okerman avers that while defendant was in the back seat of Gonzalez and Okerman's patrol vehicle, Okerman read defendant his Miranda rights "verbatim" from LBPD Form 1000.008. Okerman Decl. ¶ 17 & Ex. C. Okerman declares that he asked defendant, "do you understand each of these rights I have explained to you?" and that defendant responded, in clear English, "Yes, sir." Id. ¶ 17; Police Report at 5. Okerman asserts that he "observed the defendant to be alert, coherent, and able to understand English based on earlier responses to routine questions," and that defendant did not appear to be under the influence of drugs at the time of the Miranda exchange. Okerman denies exerting pressure or making comments about defendant's "ability or decision to provide a statement." Okerman Decl. ¶ 17.

According to Okerman's declaration and the Police Report, defendant "freely offered" the following statements in response to "waiver question number two, 'do you want to talk' ": (1) that "[a]ll the mail and stuff in the car belongs to me" and that the police "do not have me for nothing other than receiving stolen property"; (2) that defendant was mailing a letter to a friend incarcerated in county jail; (3) that the drugs in the tissue did not belong to him, but that the pipe did belong to him; (4) that he was given the mail by an unknown friend; (5) that the backpack found in the Cadillac belonged to him; (6) that he had bought the vehicle a few days prior to the incident from a friend, whose name he did not know; and (7) that defendant was "not worried about this case. You guys [the officers] did not actually see me fish out mail from the mail." Okerman Decl. ¶ 18; Police Report at 5. The officers transported defendant for booking at an LBPD station. Police Report at 5.

The Cadillac was towed to PD Tow in Long Beach. Id. at 4. Okerman asserts that when the Cadillac was stored, it was discovered that "Hector Gomez was, and had been, the registered owner of the Cadillac since 1994." Okerman Decl. ¶ 20 & Ex. E. Okerman states that "there was no evidence at the time of storage that the car had been transferred to the defendant." Id. ¶ 20.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                      **'O'**

**B.      The Suppression Hearing**

At a suppression hearing on March 16 and 17, 2015, the defense attempted to cast doubt on the above version of events, and the officers testified to details of the incident not set forth in the police report or declarations.  Relevant portions of the hearing are summarized below.

1.      Okerman's Observations of Defendant

Defense counsel attempted to impeach Okerman's declaration testimony that he first saw defendant acting suspiciously by the mailbox while he and Gonzalez were driving to the unrelated burglary.  Okerman testified that when he saw the individual wearing a black hat and black sweatshirt near the mailbox, the officers were not stopped at a red light, and that although the street corner is lit, it was raining and dark outside.  Hr'g Tr. Mar. 16, 2015 at 39:20–40:22.  Okerman stated that although the officers were responding to the burglary call with some sense of "urgency," they were not "speeding."  Id. at 42:8-15.

On redirect examination, Okerman repeated essentially the same details about his initial observation as set forth in his declaration.  He stated that the scene caught his attention because the subject was standing in front of a mailbox with a drive-up mail slot late at night in a "fairly dangerous area."  Hr'g Tr. Mar. 16, 2015 at 54:3-12.

The officers did not stop or flash their spotlight at this time, nor did they record the observation on their in-car police radio or computer or alert other officers in the area.  Id. at 41:13–42:9.  Okerman did not mention this suspicious observation to Gonzalez as the two officers responded to the burglary, or before Gonzalez wrote the police report.  Hr'g Tr. Mar. 17, 2015 at 20:8-16.  Okerman testified that he does not mention every suspicious sight to his partner, or otherwise make a record of every observation.  Hr'g Tr. Mar. 16, 2015 at 54:16–55:5.  Okerman testified that he did, however, mention to Gonzalez the person near the mailbox the second time he saw him, just before the officers stopped the Cadillac.  Id. at 55:25–56:5.  Okerman never observed the man reaching inside of or entering the car.  Id. at 43:22–44:19.  However, after the officers made a U-turn, Okerman inferred from the facts that the subject had disappeared and that the Cadillac was pulling away that the subject had gotten into the Cadillac, and was attempting to flee.  Id. at 56:10-13.

At the hearing, defense counsel called an investigator from the Federal Public Defender's Office, who testified that she drove the same route as Gonzalez and Okerman drove when responding to the burglary, and that—driving the speed limit—it took her approximately eight minutes (as opposed to the four-and-a-half minutes that dispatch notes indicate it took Okerman and Gonzalez).  Hr'g Tr. Mar. 17, 2015 at 42:3–43:14.  Based on this, defense counsel argued that Okerman and Gonzalez must have been speeding when they responded to the call, and that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

this undermines Okerman's testimony that he observed suspicious behavior at the mailbox while passing the mailboxes for the first time.  Id. at 48:3–49:6.

        2.      The License Plates Issue

      As set forth above, the police report and officers' declarations indicate that the Cadillac was stopped for "no license plates."  In his reply papers, however, defendant submitted a photograph from the night of the arrest (produced by the government after the filing of defendant's motion) that shows the Cadillac with a paper license plate featuring a blue whale and the caption, "Whale of a Deal."  Id. at 3 n.2 & Ex. D.  The license plate is surrounded by a plastic holder that appears to read "MarinaDelRayToyota.com."  Id.  On cross-examination, Okerman testified that he called in a traffic stop of a Cadillac with "dealer plates."  Hr'g Tr. Mar. 16, 2015 at 47:1-12.

      At the hearing, Gonzalez testified that on the night of the stop, he "observed a white Cadillac with no license plates" and "pulled over that car because it had no license plates." Hr'g Tr. Mar. 16, 2015 at 7:7-15.  Gonzalez stated that the car "had paper plates that belonged to a dealership," not "dealer plates," and that "[t]here's a difference" between the two.  Id. at 8:2-6.  Gonzalez stated that he has seen criminals use "fake dealer plates or fake paper plates" to cover their actual license plates, and had received training on "criminal use of fake paper plates."  Hr'g Tr. Mar. 16, 2015 at 19:10-22.   Gonzalez also testified that he has seen cars being driven with dealer-issued plates before the Department of Motor Vehicles ("DMV") issues official plates, and that he has seen "dealerships with vehicles for sale that have license plates and paper plates."  Id. at 32:17–33:13.  Gonzalez stated that he determines whether dealer or paper plates may be fake "based on the totality of the circumstances," including the "time of day, activity observed, [and] vehicle type."  Id. at 19:23–20:1.  Gonzalez testified that on November 30, 2012, he believed that the paper plates on the Cadillac may have been fake because the vehicle was "dirty," had "dents," and was "in bad shape," indicating that the car was not "a recently purchased vehicle at least from a dealership."  Id. at 20:9-17.  Gonzalez also stated that he thought the paper plates might be fake because the car was parked in front of the mailbox where the individual wearing black clothes had been seen "leaning into a post office mailbox."  Id. at 20:18–22:4.  Gonzalez testified that the Cadillac did not display a temporary operating permit on the front or back window, but conceded that he did not note this in the police report.  Id. at 35:2-24.

      Okerman testified that although he is aware that there are circumstances in which a vehicle can legally be operated with dealer-issued paper plates, he also knows that "a lot of times people will hide their plates with dealer paper plates if they're involved in some kind of criminal activity."  Hr'g Tr. Mar. 17, 2015 at 32:25-33:3; Hr'g Tr. Mar. 16, 2015 at 56:17-20. Okerman elaborated that he has seen people keep paper plates on their vehicles to avoid fees or

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

tickets, or use them to cover real license plates to avoid detection while engaged in criminal activity. Hr'g Tr. Mar. 17, 2015 at 5:16–6:2. Okerman stated that, to his knowledge, Vehicle Code 5200(a) is the provision that "applies to individuals who appear to have fake or phoney paper plates." Hr'g Tr. Mar. 16, 2015 at 58:9-13. He testified that he would use that provision to cite a car with improper paper plates. Hr'g Tr. Mar. 17, 2015 at 6:3-20. He further stated: "Having a dealer plate to me is the same as having no plates." Id. at 30:6-7.

Okerman stated that when a newly purchased car does not yet have DMV-issued license plates, the car dealership will often tape a registration tag to the front passenger side window. Id. at 9:11–10:15. He further testified that he believed on November 30, 2012 that a violation of that statute may have occurred because the Cadillac was "dirty" and an "older model car" that did not look "new or just recently bought," and had no "temporary registration sticker in the window or anything like that." Hr'g Tr. Mar. 16, 2015 at 58:14-20; Hr'g Tr. Mar. 17, 2015 at 11:4-7. Okerman also testified on redirect examination that, even if the car had DMV-issued plates, he would have pulled it over to investigate "the suspicious activity next to the mailbox." Hr'g Tr. Mar. 17, 2015 at 12:3-6.

Gonzalez testified that he did not seize the paper plates, remove them to see if they were covering other plates., or take a close-up photograph of the plates  Hr'g Tr. Mar. 16, 2015 at 29:22–30:12. He also testified that he did not take any photographs showing the condition of the vehicle. Id. at 30:14-18. Okerman similarly testified that he did not recall taking any photographs of the front of the car. Id. at 53:14-16. Gonzalez admitted that he did not state in the police report, or in his declaration, that he believed that the paper plates were fake, or that there were different license plates underneath. Id. at 30:25–32:5, 36:1-11. Okerman likewise conceded that he had an opportunity to review his declaration for truthfulness and completeness before signing it, that the declaration "state[s] specifically that the vehicle did not have a front or back license plate," and that the declaration does not mention the paper plates, lack of a visible registration sticker, or the fact that the car appeared dirty. Hr'g Tr. Mar. 17, 2015 at 23:13–27:25.

> 3.      Defendant's Parole Status and Patdown

As indicated above, the officers' declaration testimony indicated that Gonzalez checked defendant and Santory for wants and warrants, confirming that defendant was on parole for robbery. At the hearing, Gonzalez testified that he routinely asks occupants of stopped cars whether they are on probation or parole. Hr'g Tr. Mar. 16, 2015 at 23:1-7. Gonzalez testified that after Okerman got defendant's information, Gonzalez "walked back to [Gonzalez's] patrol car to run [defendant's] name in the mobile computer in [Gonzalez's] patrol car." Id. at

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA


**CRIMINAL MINUTES - GENERAL**                    **'O'**

9:21–10:13.  Gonzalez repeated multiple times that he conducted this search in his patrol car.[3] According to Gonzalez, the search revealed that defendant was on parole in California.[4]  Id. at 26:16-18.  Gonzalez stated that he told Okerman of defendant's parole before Okerman searched defendant.  Id. at 10:14-22, 26:23–27:5.  Gonzalez also testified that he took notes regarding the information returned on defendant in this computer search, and later wrote that information into a booking form filled out at the police station.  Id. at 10:23–11:24.

Okerman testified that after the stop had been made and defendant's identification produced, Gonzalez ran defendant's name "in the mobile computer in the patrol car [Okerman and Gonzalez] were riding in," and subsequently told Okerman that defendant was on parole. Hr'g Tr. Mar. 16, 2015 at 50:14-23.  Okerman then testified, as he did in his declaration, that after Gonzalez confirmed defendant's parole status, Okerman asked defendant to get out of the Cadillac because Okerman wished to perform a patdown for weapons.  Id. at 51:9-14.  Okerman cited as reasons for wanting to check for weapons that defendant was on parole for a violent crime, that Okerman suspected him of criminal activity near the mailboxes, and that persons committing a crime often carry a weapon.  Id. at 58:21–59:9, 59:19-23.  Okerman characterized the resulting search as a "patdown search," and stated that he did not "go into [defendant's] pockets," but rather "pat[ted] down for larger weapons and other items that I can feel that may hurt me during my investigation."  Hr'g Tr. Mar. 17, 2015 at 14:15-19.

At the hearing, defense counsel called Robert Belcher, who maintains the Communications Center computer systems for the LBPD, including the dispatch records system.  Hr'g Tr. Mar. 17, 2015 at 36:2-13.  Reviewing the "unit history report" for Okerman and Gonzalez's patrol car computer for the relevant time period, Belcher stated that if the officers had requested a warrants check on defendant through their computer, it would appear on that report, and that no such check appears on the report.  Id. at 36:17–40:11.  On cross-examination by the government, Belcher stated that in his experience, it is not "within the realm of possibility" for a computer entry such as a warrants check to have been erased after the fact or otherwise not appear on the unit history report.  Id. at 40:25–41:3.

---

[3]See Hr'g Tr. Mar. 16, 2015 at 10:9-10 ("Q: And again that was on the computer in your patrol car. A: Yes."); id. at 23:19-20 ("I ran him [defendant] on my computer, my police vehicle computer.").

[4]Gonzalez does not recall whether the search showed a year of conviction; he did not write down any year of conviction in his report.  Id. at 30:19-23.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                'O'

C.    **Post-Hearing Evidence on the Officers' Search for Defendant's Parole Status**

The government attached to its supplemental brief the unit history report from Officer Tith and Kong's car from November 30, 2012, which does show a wants check for defendant. Gov't Supp. Br. Ex. 1.  The government also submitted declarations from Tith and Kong stating that neither of them ran such a check on defendant, and that it is "routine practice" for LBPD officers to "use the computer in whichever patrol car is most convenient at the moment" when there are multiple cars at an investigative scene.[5]  Supp. Tith Decl. ¶¶ 4–6; Supp. Kong Decl. ¶¶ 4–6.[6]

III.   **DISCUSSION**

A.    **Standing**

As an initial matter, the parties dispute whether defendant has "standing" to challenge the officers' conduct.  The Court concludes that defendant may challenge the initial stop of the Cadillac as well as the patdown or search of his person (as well as any fruits thereof if those actions were unlawful), but may not directly challenge the subsequent search of the Cadillac.

---

[5]At the hearing, Gonzalez testified that the second patrol car arrived after he and Okerman had made "verbal contact" with defendant and Santory and "if [he] had to guess, it was [within] the first 10, 15 minutes of [the] investigation."  Hr'g Tr. Mar. 16, 2015 at 15:8-14.  Gonzalez testified that he thought the additional officers were on the scene by the time he went to his patrol car to search defendant's information.  Id. at 15:15-17.

[6]Defendant objects to this evidence on the ground that the Court ordered that the parties' supplemental briefs include no new evidence, declarations, or factual contentions.  See Dkt. No. 48; Hr'g Tr. Mar. 17, 2015 at 45:15-18.  Had the government included with its supplemental brief only new declarations asserting new facts, the Court would consider striking them on this basis.  However, having presented on the final day of the suppression hearing documentary evidence suggesting that Gonzalez and Okerman were possibly subject to further questioning about having conducted a wants and warrants check on defendant, defendant effectively invited rebuttal evidence rehabilitating the government's witnesses.  Notwithstanding the government's piecemeal presentation of evidence supporting the search, which at times raised issues about the prosecution's case, under all of the circumstances, the Court finds it appropriate to consider the newly submitted evidence insofar as it tends to indicate that Gonzalez did actually run the wants and warrants check about which he testified under oath.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

     1.     Defendant Lacks Standing to Challenge the Search of the Cadillac.

"[T]o contest the legality of a search or seizure, the defendant must establish that he or she had a 'legitimate expectation of privacy' in the place searched or in the property seized." United States v. Kovac, 795 F.2d 1509, 1510 (9th Cir. 1986) (quoting Rakas v. Illinois, 439 U.S. 128, 143–44 (1978)).  The expectation of privacy must be (1) subjectively genuine, and (2) "one that society is prepared to accept as reasonable and therefore, legitimate."  Id.  A person has such an expectation in a vehicle that he owns or otherwise exercises control over.  Id. at 1510–11.  A passenger who does not exercise control over the car, however, "has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car."  United States v. Twilley, 222 F.3d 1092, 1095 (9th Cir. 2000) (quoting United States v. Eylicio–Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995)).  The Supreme Court has held that passengers who neither owned nor leased a car had no legitimate expectation of privacy in the glove compartment or under the seats of that car because, "[l]ike the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy."  Rakas, 439 U.S. at 130–41, 148–49.  And the Ninth Circuit has stated that "as a general rule, only the owner of the vehicles or an individual with a legitimate privacy interest in the vehicles may challenge an allegedly illegal search."  United States v. Wanless, 882 F.2d 1459, 1462 (9th Cir. 1989).

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure."  Rakas, 439 U.S. at 130 n.1.  Defendant advances two theories supporting his standing to challenge the search of the Cadillac, neither of which is persuasive.

     a.     Possessory or Ownership Interest

First, defendant argues that he has a "legitimate possessory and privacy interest in the car and all separate compartments" as "the owner and passenger of the car."  Mot. at 5.  Defendant points to the police report's indication that he "claimed ownership of the car," but has produced no other evidence supporting that claim.[7]  The government counters that defendant had no reasonable expectation of privacy in the Cadillac because at the time of the arrest, an individual

---

[7]To the extent that defendant argues that it is significant that the LBPD officers believed at the time of the arrest that defendant owned the car, that argument is unpersuasive.  An "officer's belief . . . has no bearing upon the question of standing" because "[a] person's standing depends upon his justified expectation of privacy, and this is not determined upon the basis of what the police believe."  6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.3(e) at 260 (5th ed. 2012) (emphasis in original).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

named Hector Gomez was the car's only registered owner, and had been since 1994.  In his reply papers, defendant did not submit any additional evidence of ownership, but argued that "not everyone who owns or buys a car registers it with the DMV, particularly when the car is recently purchased," and that this proposition "is consistent with [defendant's] statement to LBPD officers that he had just bought the used car and can be inferred since the car still had dealer plates."  Id.  The government has the better of the argument.

"The burden is on the defendant to establish standing . . . and . . . a conclusory claim of ownership will therefore not necessarily suffice."  6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.3(e) at 264 n.345 (5th ed. 2012).  Although the Ninth Circuit has not addressed the precise issue of a passenger who claimed without corroboration to own the car in which he was riding, Twilley is somewhat analogous.  There, the Ninth Circuit held that a passenger had no reasonable expectation of privacy where the driver stated that the rental car agreement was in the passenger's name, but the agreement was actually in the name of another person not present in the vehicle.  This was so even though that other person had rented the car for the passenger's wife.  Twilley, 222 F.3d at 1094–95; see also United States v. Thomas, 447 F.3d 1191, 1194–96 (9th Cir. 2006) (driver had no standing because he had not met his burden of showing that he had rental car leaseholder's permission to drive car).  At minimum, Twilley shows that a mere claim of a possessory interest is not sufficient to confer standing to challenge an alleged Fourth Amendment violation.

Other circuits' case law is also instructive.  For example, in United States v. Dickerson, 655 F.2d 559, 561 (4th Cir. 1981), the Fourth Circuit held that, where the government introduced evidence that a plane was owned by a corporation, the defendant had to produce "some evidence that he possessed an interest in [that corporation], or that he flew the plane with permission of the owner," in order to meet his burden of establishing a legitimate expectation of privacy in the plane.  In another case, the Fourth Circuit held that where the government produced some evidence that the car at issue was stolen (though not enough to convict the defendant of car theft), the defendant was "require[d] . . . to show . . . that he acquired the car innocently" in order to establish "standing to object to a search of the vehicle."  United States v. Hargrove, 647 F.2d 411, 412 (4th Cir. 1981); see also United States v. Beall, 581 F. Supp. 1457, 1464 (D. Md. 1984) (defendant had no standing to challenge search of truck where he "introduced no proof of the truck's owner of record").

In an Eighth Circuit case, the defendant attempted to challenge the search of a plane.  United States v. Bruneau, 594 F.2d 1190 (8th Cir. 1979).  Bruneau argued that he had standing to bring that challenge because he gave a person named Cooper money to purchase an airplane for him, and that Cooper then purchased the airplane in question.  Id. at 1192.  The Eighth Circuit disagreed, noting that although Bruneau had produced evidence that he had taken out a $10,000 loan, his "alleged interest in the airplane [was] not shown on any of the ownership

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**               **'O'**

papers for the airplane." <u>Id.</u> at 1193.  Reasoning that "any reasonable person doing legitimate business would insist upon at least this indicia of his investment," the appellate court discredited Bruneau's "assertion of ownership" and affirmed the trial court's finding that he did not have standing to challenge the search of the airplane.  <u>Id.</u>

The Tenth Circuit has refused to "rule out the possibility that a passenger may have standing to challenge the search of a car," but stated that the passenger would have to "adduce[] evidence at the suppression hearing sufficient to establish her subjectively and objectively reasonable expectation of privacy in the car." <u>United States v. Eylicio-Montoya</u>, 18 F.3d 845, 851 (10th Cir. 1994); <u>see also</u> <u>United States v. Betancur</u>, 24 F.3d 73, 77 (10th Cir. 1994) (no standing where defendant "testified that someone named 'Tio' gave him the pickup truck," but there was "no evidence presented which would establish ownership in 'Tio' or a linkage between 'Tio' and" the registered owner of the car); <u>United States v. Erwin</u>, 875 F.2d 268 (10th Cir. 1989) (no standing for passenger-defendant who did not own car where "there was no evidence concerning where or from whom defendant obtained the vehicle").  Finally, the Second Circuit has held that "where the car driven by one defendant with the other defendant as a passenger was registered in someone else's name, and neither defendant showed any legitimate basis for being in the car, neither had standing" to challenge a search of the car. <u>United State sv. Sanchez</u>, 635 F.2d 47, 64 (2d Cir. 1980) (citing <u>United States v. Smith</u>, 621 F.2d 483 (2d Cir. 1980)).

In this case, the only evidence of defendant's claimed possessory interest in the Cadillac is defendant's own vague statement as set forth in the police report that he "bought the vehicle a few days [prior] from a friend he did not know the name to [sic]."  Police Report at 4. Defendant has not presented any documentary evidence or testimony that would support a claim that he purchased the Cadillac or was otherwise in lawful possession of it.  In light of the government's undisputed evidence that the car was registered at the time to an individual named Hector Gomez and had been for years, Okerman Decl. ¶ 20 & Ex. E, defendant must do more than merely point to an uncorroborated claim of ownership at the time of arrest and argue that not all car purchases are reflected in registrations.  <u>See</u> <u>Dickerson</u>, 655 F.2d at 561 (where government produces evidence searched vehicle owned by someone else, defendant has burden of producing some evidence of ownership or other legitimate interest).  Not only has defendant not produced any formal documentation of his purchase or ownership of the car, he has not produced any informal evidence, such as testimony from—or even the name of—the friend from whom he purportedly bought the Cadillac.  He has not pointed to any other "indicia of ownership," such as the "right to exclude others" from the vehicle.  <u>Thomas</u>, 447 F.3d at 1199. Nor has defendant explained the tension between his reliance on the post-arrest statement that he bought the car from an unidentified "friend," and defendant's argument, discussed below, that the traffic stop was invalid because the car had dealer plates from a specific Toyota dealership.  Finally, defendant has not produced evidence of any other circumstance that would

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                    'O'

grant him a reasonable expectation of privacy in the vehicle despite the general rule that
passengers have none.  Cf. United States v. Peraza,   No. CR-14-0290-TUC-JAS (BGM), 2014
WL 5798245, at *5 (D. Ariz. Nov. 7, 2014) (passenger had standing to challenge search of car
registered to long-term romantic partner based on her "ongoing relationship with the vehicle's
owner . . . and shared use of the vehicle").  Accordingly, the Court finds that defendant has not
met his burden of showing that he had a possessory or ownership interest in the Cadillac that
would permit him to directly challenge the search of that vehicle.

    b.  Inconsistent Government Arguments

   Defendant also argues that he may challenge the search of the car because "the
government alleges that [defendant] possessed all of the items seized from the car."  Mot. at 5.
Defendant cites United States v. Isaacs, 708 F.2d 1365, 1368 (9th Cir. 1983), for the proposition
that the law "does not permit the government to argue possession but deny expectation of
privacy where the circumstances of the case make such positions necessarily inconsistent."  The
Isaacs court, however, articulated this rule along with the principle that "a prosecutor may
simultaneously maintain that a defendant criminally possessed the seized good, but was not
subject to a Fourth Amendment deprivation, without legal contradiction."  Id. at 1367 (quoting
United States v. Salvucci, 448 U.S. 83, 90 (1980)).  Thus:

> The government may properly contend that a defendant owned drugs which,
> moments before the challenged search, he had placed in his girlfriend's
> purse, in which he had no legitimate expectation of privacy.  See Rawlings
> v. Kentucky, 448 U.S. 98, 104–06 (1980).  It may argue that checks found in
> the apartment of another in which a defendant had no legitimate expectation
> of privacy belonged to the defendant.  See Salvucci, 448 U.S. at 85, 95.  It
> may properly seek to introduce evidence seized from a room with which a
> defendant had no connection beyond mere presence and thus no legitimate
> expectation of privacy.  See United States v. Irizarry, 673 F.2d 554, 556 (1st
> Cir. 1982).

Isaacs, 708 F.2d at 1368 (citation formatting altered).  The government may not, however,
concede that a defendant "had 'a legitimate expectation of privacy in the invaded place,' " while
arguing that the defendant had no such expectation of privacy "in the items found there."  Id.
(quoting Rakas, 439 U.S. at 143).  Therefore, the Isaacs court held that, where the government
admitted that the defendant had a legitimate expectation of privacy in a locked safe hidden in a
closet in his own apartment, the government could not successfully argue that the defendant had
no legitimate expectation of privacy in a journal found in that safe, even though the defendant
disclaimed ownership or awareness of the journal.  Id. at 1367–68.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

The government argues that, under <u>Isaac</u> and related case law, defendant "could not create an expectation of privacy for himself by simply storing the stolen mail in the Cadillac any more than the defendant in <u>Rawlings</u> could create an expectation of privacy by storing his drugs in his girlfriend's purse." Nor, the government contends, can the fact that defendant is charged with possession of stolen mail "alone extend defendant an expectation of privacy where one does not otherwise exist." Opp'n at 12. The Court agrees: there is no inconsistency between the government's contentions that defendant (1) had no reasonable expectation of privacy in a vehicle in which he was a mere passenger and (2) possessed contraband that he placed in that vehicle. <u>See</u> <u>Salvucci</u>, 448 U.S. at 92 ("We simply decline to use possession of a seized good as a substitute for a factual finding that the owner of the good had a legitimate expectation of privacy <u>in the area searched</u>." (emphasis added)); <u>Hargrove</u>, 647 F.2d at 412 ("A person who cannot assert a legitimate claim to a vehicle cannot reasonably expect that the vehicle is a private repository for his personal effects, whether or not they are enclosed in some sort of a container.").

In sum, defendant has not established that he had a reasonable expectation of privacy in the Cadillac such that he can directly challenge the search thereof. Accordingly, the Court does not address defendant's suppression arguments that depend on him having such standing.

       2.      Defendant Has Standing to Challenge the Stop of the Cadillac and Fruits Thereof.

Notwithstanding the general rule that a passenger has no reasonable expectation of privacy, "a passenger may challenge a <u>stop</u> of a vehicle on Fourth Amendment grounds even if she has no possessory or ownership interest in the vehicle." <u>Twilley</u>, 222 F.3d at 1095 (internal quotation marks omitted) (emphasis added).[8] Further, even if a passenger does not have standing to challenge a vehicle search directly, a passenger who establishes that the initial stop of the car violated the Fourth Amendment can suppress evidence seized as a result of that stop as "fruit of the poisonous tree." <u>Id.</u> This principle, however, does not apply where "the initial stop is lawful"; in that situation, "a passenger with no possessory interest in a vehicle usually cannot object to <u>its</u> continued detention or suppress the fruits of that detention." <u>United States v. Pulliam</u>, 405 F.3d 782, 788–89 (9th Cir. 2005) (emphasis in original).

---

[8]The Supreme Court cited <u>Twilley</u> with approval in holding that a passenger is seized along with the driver during a traffic stop, and may challenge the legality of that stop. <u>Brendlin v. California</u>, 551 U.S. 249, 259 (2007).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                    'O'

Under Twilley, defendant has standing to challenge the legality of the initial traffic stop, and to suppress any fruits of that stop if the initial stop was unlawful.[9]  Therefore, the Court must determine (1) "whether the stop was unconstitutional," and (2) "[i]f it was . . . whether the subsequent search was tainted by the illegality of the stop." Twilley, 222 F.3d at 1095–96.  If the stop was unconstitutional, the "government has the burden to show that the evidence is not 'the fruit of the poisonous tree.' " Id. at 1097 (quoting United States v. Johns, 891 F.2d 243, 245 (9th Cir. 1989)).

B.      The Traffic Stop

The Fourth Amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  "Because stopping an automobile and detaining its occupants, 'even if only for a brief period and for a limited purpose,' constitutes a 'seizure' under the Fourth Amendment, an official must have individualized 'reasonable suspicion' of unlawful conduct to carry out such a stop." Tarabochia v. Adkins, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting Whren v. United States, 517 U.S. 806, 809–10 (1996), and Delaware v. Prouse, 440 U.S. 648, 663 (1979)); see United States v. Lopez-Soto, 205 F.3d 1101, 1104–05 (9th Cir. 2000) (holding that an investigative traffic stop requires reasonable suspicion, not probable cause).  "Reasonable suspicion" means "a particularized and objective basis for suspecting the particular person stopped of criminal activity." Twilley, 222 F.3d at 1095.  "[T]he constitutionality of a traffic stop does not depend on the subjective motivation or intent of the officers." United States v. Wallace, 213 F.3d 1216, 1219 (9th Cir. 2000) (citing Whren, 417 U.S. at 813).  Accordingly, "[t]he fact that the alleged traffic violation is a pretext for the stop is irrelevant, so long as the objective circumstances justify the stop." Id.  If an officer who executes a valid stop reasonably believes that the driver is involved in criminal activity, "he may detain him for a reasonable period of time." United States v. Martinez, 403 F. App'x 182, 183 (9th Cir. 2010) (citing Terry v. Ohio, 392 U.S. 1, 21–23 (1968), and United States v. Chavez-Valenzuela, 268 F.3d 719, 726 (9th Cir. 2001), overruled on other grounds by Muehler v. Mena, 544 U.S. 93 (2005)).

The government's opposition papers defended the traffic stop on the ground that the officers had reasonable suspicion that the Cadillac did not display valid license plates, which if true would violate the California Vehicle Code and justify the stop regardless of the officers' subjective intentions.  See Pulliam, 405 F.3d at 787 ("The malfunctioning taillight provided lawful grounds for the stop, regardless of the officers' motivations.").  At the hearing, the government argued that, in addition or alternatively to the license plates issue, the officers'

[9]It is also clear that defendant may challenge the legality of the patdown or search of his person.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

observations of suspicious activity near the mailbox supported the stop. The Court first addresses California law relating to paper license plates, then assesses whether the officers had reasonable suspicion to effectuate a traffic stop under the circumstances.

      1.     Applicable California Vehicle Code Law

     As detailed above, at the time of the stop, the Cadillac appears to have had paper plates from a local Toyota dealership, rather than simply an empty space where the license plates would be placed. Defendant argues that because it is sometimes permissible to drive a car with temporary dealer plates, "there was no particularized and objective basis for suspecting that the [Cadillac] was being operated contrary to law." Reply at 3. At the suppression hearing, the government responded to this contention by arguing that a car may not validly be operated with <u>only</u> paper dealer plates, and that other factors in this case support the officer's decision to pull over the Cadillac.

     The government is correct that paper dealer-issued plates, by themselves, are not sufficient to legally operate a vehicle in California. Statute provides that "[a] vehicle displaying a copy of the report of sale may be operated without license plates or registration card until either . . . [t]he license plates and registration card are received by the purchaser" or a "90-day period, commencing with the date of sale of the vehicle, has expired." Cal. Veh. Code § 4456(c).[10] The California Supreme Court has stated that "[a]ny vehicle driven on the roadway must display valid license plates or a valid temporary permit." <u>People v. Hernandez</u>, 45 Cal. 4th

---

    [10]Defendant's citation to California Vehicle Code section 11715 is misplaced. That provision allows car dealers and prospective buyers of dealer-owned cars to operate unregistered cars under certain circumstances "upon condition that the vehicle displays special plates issued to the owner as provided in this chapter, in addition to other license plates or permits already assigned and attached to the vehicle in the manner prescribed in [Vehicle Code] Sections 5200 to 5203, inclusive." Cal. Veh. Code § 11715. But the "special plates" to which this section refers are plates issued by the DMV, not paper plates provided by the dealers themselves. <u>See</u> <u>Lyman v. Mercedes-Benz, USA, LLC</u>, No. D052585, 2009 WL 143695, at * (Cal. Ct. App. Jan. 22, 2009) (unpublished) ("The narrow issue . . . is thus whether a vehicle . . . that displays special dealer license plates (Veh. Code §§ 11714, 11715), constitutes a 'vehicle[] . . . registered . . . in California.'"); Cal. Veh. Code § 11714(d) ("When the department has issued a license pursuant to subdivision (a), the licensee may apply for <u>and the department shall issue special plates</u> which shall have displayed thereon the general distinguishing number assigned to the applicant." (emphasis added)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**             **'O'**

295, 298 (2008).[11]  In a companion case to <u>Hernandez</u>, the high court held that a police officer had reasonable suspicion to stop a vehicle where the officer "saw neither license plates nor a temporary permit before he made the stop."  <u>In re Raymond C.</u>, 45 Cal. 4th 303, 307 (2008). Rejecting the appellant's argument that the officer "should have driven around the vehicle to see all the windows" to check for a temporary permit, the court noted that the " 'reasonableness of [an] officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques,' " and that an officer is not "required to eliminate all innocent explanations that might account for the facts supporting a particularized suspicion."  <u>Id.</u> at 308 (brackets in original) (quoting <u>United States v. Sokolow</u>, 390 U.S. 1, 11 (1989)).

In an unpublished opinion, the California Court of Appeal upheld a trial court's determination that a nighttime traffic stop was reasonable where the car "had dealer paper plates [and] the officer didn't see a temporary window sticker as he passed the car," so that the officer did not know "whether or not the car [was] properly registered because there [was] no visible registration tag . . . or license number to run."  <u>People v. Frost</u>, No. A115733, 2007 WL 2697359, at *2 (Cal. Ct. App. Sept. 17, 2007).[12]  In that case, the car had paper dealer plates and a temporary operating permit on the front windshield of the car, but the officer did not see the temporary operating permit until after he had effectuated the stop.  <u>Id.</u> at *2–3.  Under these circumstances, the appellate court found that the officer "had a reasonable suspicion that the car was being operated without license plates in violation of" Vehicle Code section 5200, which "justified a brief detention in order to verify the registration of the car" notwithstanding the fact that the vehicle turned out to be properly registered.  <u>Id.</u> at *3–4.

A non-precedential opinion of the Ninth Circuit, affirming the denial of a motion to suppress, is also instructive.  <u>See</u> <u>United States v. Moore</u>, 357 F. App'x 14 (9th Cir. 2009), <u>cert</u>

---

[11]The <u>Hernandez</u> court then held under the United States Constitution that an "officer who sees a vehicle displaying a temporary operating permit in lieu of license plates may not stop the vehicle simply because he or she believes that such permits are often forged or otherwise invalid," absent a "reasonable suspicion that the particular permit is invalid."  <u>Id.</u> at 297.  In <u>Hernandez</u>, unlike here, the officer perceived that the car displayed a facially valid temporary operating permit in the rear window, but decided to pull the car over anyway solely based on his experience that such permits are "very often" invalid, issued for a different vehicle, or attached to a stolen car.  45 Cal. 4th at 297–98.  In this case, defendant has not argued that the Cadillac displayed a temporary operating permit or report of sale, and the officers testified that it did not.

[12]Although they are not precedential, unpublished opinions of the California Court of Appeal may be considered as persuasive authority.  <u>CPR for Skid Row v. City of Los Angeles</u>, 779 F.3d 1098, 1117 (9th Cir. 2015) (citing <u>Employers Ins. of Wausau v. Granite State Ins. Co.</u>, 330 F.3d 1214, 1220 (9th Cir. 2003)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**          **'O'**

denied, 560 U.S. 934 (2010).  There, the defendant, whose car lacked license plates but had a temporary registration placed in the lower right corner of his windshield, argued that the stop was unreasonable because the officers did not check his windshield to see if a temporary registration was posted there.[13]  Id. at 15.  The court disagreed, finding that it was "reasonable for the officers to conduct the stop despite failing to check the windshield" because the "officers were not required to negate every possible innocent explanation for the lack of plates before making the stop."  Id. at 16.  The court reasoned that "in addition to the lack of license plates (which in most cases constitutes a violation of California law), a variety of factors enhanced the reasonableness of the stop," including that: (1) the temporary registration was posted on the windshield rather than the rear window, (2) the temporary registration was folded such that the registration information was not visible, and (3) the "officers testified that in their experience, car thieves often display pieces of paper in their windshields to make it seem like the car is legitimately registered, and thus seeing a piece of paper in the windshield . . . would have done little to negate their reasonable suspicion."  Id.

Synthesizing the relevant published case law and statutes, and aided by the reasoning of unpublished appellate opinions, the Court concludes that reasonable suspicion of a potential violation of California Vehicle Code section 5200 could have existed notwithstanding the presence of paper dealer plates on the Cadillac, if the officers perceived no displayed temporary operating permit or report of sale or had other particular, objective reasons for believing the car might be in violation of the Vehicle Code.  Reasonable suspicion could have been informed by the officers' training and experience regarding criminals' deceptive use of paper license plates, and the officers would not necessarily be required to exhaust all innocent explanations for the paper plates before pulling over the car.  The Court now turns to the facts of this case.

2.      Reasonable Suspicion

The officers' declarations and the government's initial opposition papers omitted or presented in an unclear manner significant details relating to the justification of the traffic stop, making this perhaps a closer case than it needed to be.  Nevertheless, the Court concludes that Okerman and Gonzalez had reasonable suspicion to pull over the Cadillac for a potential violation of California Vehicle Code section 5200.

---

[13]The DMV handbook directs purchasers to display the temporary registration in the lower rear window unless the registration would be obscured, in which case the purchaser may display the temporary registration in the lower right corner of the windshield.  Moore, 357 F. App'x at 15 (citing Handbook of Registration Procedures § 2.020 (2007), available at http://www.dmv.ca.gov/pubs/reg_hdbk_pdf/ch02.pdf (visited Nov. 3, 2009)).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**            **'O'**

The officers testified that they observed the Cadillac to have paper dealer plates. Even though under some circumstances a car can be legally operated with such paper plates, the officers testified that they did not observe the vehicle to display a temporary registration sticker, report of sale, or operating permit, which would be required in addition to the dealer paper plates in order for the Cadillac to comply with the Vehicle Code. Additional factors contributing to the reasonableness of the stop include: (1) the officers' observations that the car appeared old, dirty, and dented, and for those reasons unlikely to be newly purchased from a dealership, (2) the officers' training on and experience with the use of phony paper license plates to avoid fees or detection of criminal activity, (3) the fact that the Cadillac—which Okerman testified had been stopped at the same location for close to an hour—pulled away just as the officers made a U-turn, and (4) Okerman's inference that a person he observed standing near a Postal Service collection box twice in a forty-minute-long period on a rainy night had entered a nearby car when that person disappeared from view at roughly the same time that the car pulled away.[14] Under the totality of the circumstances, the Court finds that the officers had "a particularized and objective basis for suspecting" that a Vehicle Code violation was afoot.

3.      Questioning During the Stop

Separately, defendant argues that the LBPD officers lacked reasonable suspicion to conduct an investigatory stop of the Cadillac because the purported justifications for the stop were not furthered by the officers' questions about whether defendant or Santory was on parole or probation. Mot. at 6. If this argument is intended to show that the stop was a pretext for investigation, that argument is unavailing because "the constitutionality of a traffic stop does not depend on the subjective motivation or intent of the officers." Wallace, 213 F.3d at 1219. To the extent defendant contends that the questioning shows there was no objective basis for the stop, the Court disagrees for the reasons stated above.

To the extent that defendant argues that the officers' questioning about defendant's parole status made the continued stop improper, that argument is also unpersuasive. " '[M]ere police questioning does not constitute a seizure' unless it prolongs the detention of the individual and, thus, no reasonable suspicion is required to justify questioning that does not prolong [a] stop."

---

[14]The Court does not decide whether Okerman's observations of defendant would, by themselves, have justified pulling the Cadillac over to investigate the allegedly suspicious behavior near the mailbox. Rather, the Court finds that the somewhat unusual behavior by a person who appeared to have gotten into the Cadillac, which departed just as the police made a U-turn, could have lent additional support to the officers' conclusion that the paper license plates, which the officers believed are sometimes used to conceal criminal activity, might not be legitimate.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**              **'O'**

United States v. Mendez, 476 F.3d 1077, 1080 (9th Cir. 2007) (quoting Muehler v. Mena, 544 U.S. 93, 101 (2005)); see Muehler, 544 U.S. at 100–02 (reversing determination that officers were required to have independent reasonable suspicion to question lawfully detained person concerning immigration status).[15]  In Mendez, the Ninth Circuit held that, following a valid traffic stop of a car for failure to display a license plate or registration tag, officers' posing of questions unrelated to the purpose of that stop did not implicate the Fourth Amendment because the questioning "did not extend the duration of a lawful stop" and for that reason "need not have been supported by separate reasonable suspicion."  Id. at 1079–81.  In United States v. Turvin, 517 F.3d 1097 (9th Cir. 2008), the Ninth Circuit clarified that questions unrelated to the purpose of the initial stop need not be supported by separate reasonable suspicion even when they briefly extend the stop, so long as the questioning does not "unreasonably prolong the duration of the stop."  Id. at 1102–04 (emphasis added).  Subsequently, the Supreme Court confirmed that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop."  Arizona v. Johnson, 555 U.S. 323, 333 (2009).

Here, it could not have taken more than a few seconds for Officer Gonzalez to ask defendant and Santory if either was on probation or parole.  Further, that such questioning related to officer safety and sought information that would be revealed by a routine records check militate against a finding of unreasonableness.  See United States v. Singleton, 608 F. Supp. 2d 397, 404 (W.D.N.Y. 2009) (officer conducting stop could ask defendant "some basic questions about whether [defendant] was carrying any weapons, or whether he was then on probation or parole" (citing Johnson, 555 U.S. at 323)); United States v. Sparks, No. CR407-127, 2007 WL 2422126, at *5 & n.5 (S.D. Ga. Aug. 22, 2007) (asking whether a driver or his passengers is on probation or parole "is entirely appropriate even when posed during a routine traffic stop" (citing United States v. Purcell, 236 F.3d 1274, 1276 (11th Cir. 2001))); Miller v. State, 922 A.2d 1158, 1163 (Del. 2007) (holding it permissible for an officer to ask lawfully detained defendant if he was on probation); see also United States v. Evans, 445 F. App'x 29, 31 (9th Cir. 2011) (unpublished) ("A police officer may also lawfully conduct a check on the passenger using his or her identification."); United States v. Morneau, 392 F. App'x 614, 615 (9th Cir. 2010) (unpublished) ("A motorist's general expectations in a traffic stop include a

_____

[15]In Mendez, the Ninth Circuit held that Muehler had impliedly overruled previous Ninth Circuit cases holding that "such questioning must be supported by separate reasonable suspicion."  Mendez, 476 F.3d at 1080–81; see also United States v. Turvin, 517 F.3d 1097, 1099–1100 (9th Cir. 2008) (Mendez "acknowledged that the Supreme Court had overruled those portions of [an earlier case] . . . that required police officers to have reasonable suspicion to ask questions beyond the scope of a traffic stop.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

records check."). The Court concludes that this delay was not unreasonable, and could not convert an otherwise valid traffic stop into an unlawful detention.

### C.    Patdown or Search of Defendant

Defendant argues that an additional invalid step in the officers' investigation was an unwarranted patdown or search of defendant.  In Terry, the Supreme Court held that where an investigatory stop is supported by reasonable suspicion, a "limited search of outer clothing for weapons"—often referred to as a "patdown" or "frisk"—is "reasonable under the Fourth Amendment."  Johnson, 555 U.S. at 330 (citing Terry, 392 U.S. at 23–24, 27, 30).  The Court later held that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop."  Maryland v. Wilson, 519 U.S. 408, 415 (1997).  Additionally, "officers who conduct 'routine traffic stop[s]' may 'perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous.' " Johnson, 555 U.S. at 332 (quoting Knowles v. Iowa, 525 U.S. 113, 117–18 (1998)).

Under Terry and its progeny, a "patdown" or "stop and frisk" is a permissible part of a traffic stop if: (1) the initial investigatory stop was lawful, a condition that is "met whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation"; and (2) the police have "reasonable suspicion that the person subjected to the frisk is armed and dangerous."  Id. at 326–27.  Above, the Court resolved the first step of this test in the government's favor.  As to the second part of this test, reasonable suspicion to justify a patdown or frisk is analyzed objectively under the "totality of the circumstances surrounding the stop," and in light of the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers."  United States v. Burkett, 612 F.3d 1103, 1107 (9th Cir. 2010) (quoting United States v. Hall, 974 F.2d 1201, 1204 (1992)).  The crime of which the person is suspected is relevant, as can be the location and time of day.  See United States v. Mattarolo, 209 F.3d 1153, 1158 (9th Cir. 2000) (finding relevant the fact that the frisk occurred "on a remote section of road at midnight" and was of a nighttime burglary suspect).  Other factors that have been found relevant include nervous or aggressive behavior, bulges in an individual's clothing, and association with gang members or other criminals.  See Tuttelman v. City of San Jose, 420 F. App'x 758, 761 (9th Cir. 2011) (citing cases); United States v. Montes, 343 F. App'x 288, 288 (9th Cir. 2009).  "Although a prior criminal history alone cannot establish reasonable suspicion . . . it is permissible to consider such a fact as part of the total calculus of information."  Burrell v. McIlroy, 464 F.3d 853, 858 n.3 (9th Cir. 2005).

Applying these principles, the Court concludes that Okerman was justified in patting down defendant for weapons.  The Cadillac was pulled over after midnight, and Okerman had some reason to believe that defendant had engaged in criminal behavior near the mailboxes.  Additionally, defendant was riding in a vehicle that appeared to lack valid license plates or a

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**            **'O'**

temporary permit that would allow it to be driven without such plates, and Okerman knew from his training and experience that paper dealer plates were sometimes used by criminals to evade identification.  Finally, it is undisputed that before he ordered defendant out of the car, Okerman was aware that defendant had previously been convicted of a violent crime, and had indicated that he was on parole for robbery.[16]  Under these circumstances, Okerman could reasonably have suspected that Okerman was armed and dangerous.

Defendant also argues that Okerman's declaration testimony shows that the "patdown" was actually an investigative search without probable cause.  Because the "sole justification" of a patdown "is the protection of the police officer and others nearby . . . it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer."  Terry, 392 U.S. at 29; see also Minnesota v. Dickerson, 508 U.S. 366 (1993) ("If the protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under Terry and its fruits will be suppressed.").  The Court finds this argument unpersuasive.  Although it is true that Okerman used the verb "search" in his declaration, he made clear through his live testimony that at this point in the encounter, he did not search defendant's pockets, and only patted defendant down for "larger weapons and other items that I can feel that may hurt me during my investigation."  Hr'g Tr. Mar. 17, 2015 at 14:15-19.[17]  Defendant offers no contrary evidence.

In sum, the patdown of defendant was not constitutionally defective so as to justify suppression of any evidence.

---

[16]The evidence indicates that one of the officers did run defendant's names for wants and warrants, although in Tith and Kong's patrol car rather than in Gonzales and Okerman's, as Gonzalez testified.  This perhaps shows that Gonzalez does not remember every detail of the traffic stop and search that occurred over two years ago, but the Court does not find it to completely undermine his credibility as a witness.  However, because the evidentiary record is unclear on whether Okerman was specifically aware that defendant's parole included a search term, the Court assumes that he was not, and that reasonable suspicion for the patdown was required.  See United States v. Caseres, 533 F.3d 1064, 1075–76 (9th Cir. 2008) (holding that California statute imposing suspicionless search condition on parolees whose offense is committed on or after January 1, 1997 justifies a search under the Fourth Amendment "only if the police had advance knowledge that the search condition applied before they conducted the search").

[17]Even if Okerman did exceed the scope of a permissible patdown, it is not clear that would require the suppression of evidence, because the drug-related evidence that led to defendant's arrest and the subsequent discovery of the evidence relating to the charged crime was dropped by defendant, not discovered through Okerman's alleged searching.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES - GENERAL**                    **'O'**

D.    **Waiver of Defendant's <u>Miranda</u> Rights**

Under the Supreme Court's landmark decision in <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), a suspect in custody must be advised, in substance, as follows:

> "He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

<u>Berghuis v. Thompkins</u>, 560 U.S. 370, 380 (2010) (quoting <u>Miranda</u>, 384 U.S. at 479).  "Before a defendant's self-incriminating statements may be admitted into evidence, 'a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.' " <u>United States v. Rodriguez</u>, 518 F.3d 1072, 1076 (9th Cir. 2008) (quoting <u>Miranda</u>, 384 U.S. at 475). A waiver is "knowing and intelligent" if it is "made with a 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " <u>United States v. Doe</u>, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc) (quoting <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).  The waiver must also be voluntary, meaning that any statement obtained "was the product of a free and deliberate choice rather than coercion or improper inducement." <u>Id.</u>  "[C]oercive police activity is a necessary predicate to finding that a confession is not 'voluntary.' " <u>Colorado v. Connelly</u>, 479 U.S. 157, 167 (1986).

"Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." <u>Doe</u>, 155 F.3d at 1074 (internal quotation marks and citations omitted).  "Waivers of <u>Miranda</u> rights need not be explicit; a suspect may impliedly waive the rights by answering an officer's questions after receiving <u>Miranda</u> warnings." <u>United States v. Rodriguez–Preciado</u>, 399 F.3d 1118, 1127 (9th Cir.), <u>modified in other part</u>, 416 F.3d 939 (9th Cir. 2005).

The Court finds that the government has met its burden of showing a voluntary, knowing and intelligent waiver of defendant's <u>Miranda</u> rights through Okerman's uncontested declaration testimony.  As related above, Okerman declares that he read defendant his rights verbatim from an LBPD <u>Miranda</u> form, and that defendant gave a clear affirmative response to the question, "Do you understand each of these rights I have explained to you?"  The form from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES - GENERAL                'O'

which Okerman testifies he read closely tracks Miranda's operative language.[18]  Okerman also states that, immediately following the reading of these rights and confirmation of defendant's understanding of them, he asked "do you want to talk," and that defendant "freely offered" the statements he now seeks to suppress.  Okerman Decl. ¶¶ 17–18.  The government also points to Okerman's and Gonzalez's testimony that defendant was observed to be alert, coherent, and able to understand English at the relevant time, and did not appear to be under the influence of drugs.  Id. ¶ 17; Gonzalez Decl. ¶ 6.  Defendant has not introduced any contrary evidence, and did not offer Miranda-related argument in his reply papers or at the hearing.  Accordingly, the Court finds that the government has met its burden of showing that defendant was advised of his Miranda rights, and knowingly and intelligently waived those rights by offering statements after being asked "do you want to talk" immediately following the recitation of his rights.

IV.   CONCLUSION

        In accordance with the foregoing, defendant's motion to suppress is **DENIED** in its entirety.

        IT IS SO ORDERED.

|                              | 00            | : | 00         |
| ---------------------------- | ------------- | - | ---------- |
| Initials of Deputy Clerk     |               | CMJ |          |

------

        [18]The "statement of subject's rights" on this form reads as follows:

        1.     You have the right to remain silent.
        2.     Anything you say can and will be used against you in a court of law.
        3.     You have the right to talk to a lawyer and have him present with you while you are being questioned.
        4.     If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.

Okerman Decl. Ex. C.  The "waiver" section on this form reads as follows:

        *After the warning and in order to secure a waiver, the following questions should be asked and an affirmative reply secured as to each question.*
        1.     Do you understand each of these rights I have explained to you?
        2.     Having these rights in mind, do you WAIVE THESE RIGHTS?

Id.